## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Linda Gifford,

                Plaintiff,

        v.

Target Corporation,

                Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-2049 ADM/LIB

---

Michelle Dye Neumann, Esq. and Joni M. Thome, Esq., Halunen & Associates, Minneapolis, MN, on behalf of Plaintiff.

Mark Girouard, Esq. and Joseph G. Schmitt, Esq., Nilan Johnson Lewis, Minneapolis, MN, on behalf of Defendant.

---

## I.  INTRODUCTION

On July 19, 2011, the undersigned United States District Judge heard oral argument on Defendant Target Corporation's Motion for Summary Judgment [Docket No. 37].   Plaintiff Linda Gifford asserts claims for violations of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-.41.  For the following reasons, Defendant's motion is granted.

## II.  BACKGROUND[1]

Plaintiff began working for Defendant in 1973, eventually ascending to the position of store department manager, also known as "Executive Team Leader" or "ETL."  In 2004, Plaintiff transferred to Defendant's store in Brainerd, Minnesota, where she managed the "Hardlines" department, composed of retail goods other than clothing and jewelry.  Girouard Decl. [Docket No. 40], Ex. A ("Gifford Dep.") at 48; Kuiper Decl. [Docket No. 41] ¶ 3.  Because of its location in a seasonal resort area, the Brainerd store was chronically understaffed and experienced frequent absenteeism.  Gifford Dep. at 50-52.   While managing Hardlines, Plaintiff received high performance ratings, first from store manager Tara Johnson and then from her successor, Megan Kuiper.  Neumann Decl. [Docket No. 46] Ex. 3.

In the summer of 2007, Kuiper asked Plaintiff, then age 54, to manage the store's troubled Logistics department.  Gifford Dep. at 55.  Logistics suffered from high turnover; in 2007, 35 employees – about 87% of its staff –  were terminated.  Neumann Decl. Exs. 4, 5.  Plaintiff knew that four prior managers of Logistics had tried and failed to improve the department's performance; some had left the company.  Gifford Dep. at 56.  Kuiper told Plaintiff

---

[1] Many of the facts are contested.  As required on a motion for summary judgment, the facts are taken in the light most favorable to Plaintiff, the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).   Plaintiff was deposed on May 9, 2011.  In response to Defendant's motion she has submitted a Declaration dated June 1, 2011 [Docket No. 47] which presents many additional facts not disclosed at her deposition three weeks before.  Affidavits that contradict earlier deposition testimony may not be used to create a fact issue, unless the deposition reveals confusion or mistake and the affidavit seeks to explain or clarify the deposition testimony.  Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365 (8th Cir. 1983); Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 541 n.4 (Minn. 2001).  Plaintiff's Declaration will be considered only to the extent that it seeks to explain and clarify evidence presented elsewhere in the record.  Even if Plaintiff's Declaration were to be considered in its entirety, the Court would find its additional facts do not create a triable issue of material fact.

she wanted someone "more mature" in this challenging position. Id. at 56-58. Plaintiff, who

had previously managed the Logistics department of another store, see id. at 33, accepted the

transfer. Before her transfer, Plaintiff's performance was rated good to excellent. Girouard

Decl. Exs. E - I.

The Logistics department's function is to ensure that merchandise moves swiftly and

accurately from arriving freight trucks into the storeroom and then onto the sales floor. Gifford

Dep. at 33-37. All other departments of the store depend on Logistics completing its work.

Kuiper Decl. ¶ 8. Plaintiff's role was to manage several "Team Leaders" who in turn managed

other employees unloading trucks, pulling merchandise from the stockroom, and properly

stocking the sales floor. Gifford Dep. at 37, 39, 53; Neumann Decl. Ex. 2. Plaintiff was

responsible for scheduling each employee's hours and finding replacements for absent

employees. Gifford Dep. at 34-35, 42. Plaintiff's performance was rated in part based on how

often her team completed its work on time. Girouard Decl. Ex. B, C. If the team completed its

work by 11:00 a.m. each day, it was rated "Green" for the day; if not, it was rated "Red."

Gifford Decl. ¶ 5. Accordingly, when an employee failed to report for work and could not be

replaced, Plaintiff was required to pitch in and work alongside her staff to set an example and

help the team meet its goals. Gifford Dep. at 42-45. Because of the high levels of absenteeism

among her staff, Plaintiff found it difficult to meet her own performance goal of spending at least

50% of her time on supervisory tasks. Id. at 73-76.

Despite these challenges, Plaintiff completed her first year in Logistics largely without

incident. See Kuiper Decl. ¶ 4. In April 2008 Kuiper gave Plaintiff a positive performance

review for 2007, which Plaintiff believed was fair and accurate. Gifford Dep. at 116-18;

3

Girouard Decl. Ex. J.  When district managers made unannounced visits to the store in May and June 2008, Logistics' overall rating was "Green."  Girouard Decl. Ex. FF at 1250-52.  On July 17, 2008, Kuiper began a three-month maternity leave, elevating Human Resources manager Aaron Onkka to be in charge of the store.  Kuiper Decl. ¶ 5.  During this time Onkka stated several times that the company needed "fast, fun and friendly" employees rather than "older, mature" employees.  Gifford Dep. at 121-22.  Plaintiff found this comment offensive.  Gifford Dep. at 265.

In Kuiper's absence, the performance of the Logistics department deteriorated.  During an unannounced store visit on July 31, 2008, while Plaintiff was on vacation, the district manager and a high level company executive observed the Logistics department was disorganized, and that calendars and progress charts were not being kept up to date.  Girouard Decl. Exs. K, T at 1314-15.  The department was rated "Red" for the July 31 visit.  Kuiper Decl. ¶ 7.

The Brainerd store also continued to lose personnel; in August and September 2008, the store lost 21 employees, many of them from Logistics.  Gifford Dep. at 130.  Plaintiff did not have the authority to approve overtime for her staff, and found it difficult to meet the company's goals with fewer employees.  Gifford Dep. at 36, 133.  When the district manager visited on August 15, Logistics was again rated "Red."  Girouard Decl. Ex. T at 1316-17; Kuiper Decl. ¶ 7.  In response, Plaintiff wrote an "Action Plan," urging the hiring of additional staff.  Neumann Decl. Ex. 8.  Plaintiff attributed her department's problems to conflicting direction from her superiors.  Gifford Dep. at 135-36.

Logistics was rated "Red" again at the next district manager visit on October 9, 2008. Girouard Decl. Ex. T at 1320-21.  Plaintiff submitted another "Action Plan" requesting additional staff.  Neumann Decl. Ex. 8.  On October 10, 2008, she met with Kuiper, who had recently returned from her leave.  Kuiper expressed concerns that Logistics was not meeting its goals and had been rated "Red" for three consecutive visits.  Gifford Dep. at 150-51; Neumann Decl. Ex. 9; Girouard Decl. Ex. L.  Plaintiff later emailed her counterpart in another store's Logistics department.  Neumann Decl. Ex. 10.  She learned the other Logistics department did not always meet the 11:00 deadline, a goal her counterpart believed was not always "realistic." Id.

On October 11, 2008, Kuiper discovered in the Logistics area a large amount of stock waiting to be moved; she advised Plaintiff that the pattern of leaving work undone needed to change.  Girouard Decl. Ex. M.   The same day Plaintiff left for a scheduled two-week vacation, expecting the store's other managers would "step[] in and help[]" Logistics; however, while she was away, Logistics consistently failed to meet its daily goals.  Gifford Dep. at 133-34.  On October 13, 2008, two of Plaintiff's Team Leaders complained to Kuiper about Plaintiff's leadership.  Gifford Dep. at 148, 150-51, Girouard Decl. Ex. L at 2.

By the end of October 2008, the Brainerd store had hired 12 new Logistics employees. Gifford Dep. at 153.  At the district manager visit on November 6, Logistics was rated "Green" and "Yellow."  Girouard Ex. T at 1322-23.  In her Declaration, Plaintiff claims Kuiper later told her she should have been more "energetic" when speaking to the district manager.  Gifford Decl. ¶ 17.

The approaching holiday season brought additional problems.  Kuiper authorized Plaintiff to approve vacations for her staff, which she did; yet during the same period, extra freight deliveries were scheduled, and the department once again found itself unable to meet company performance goals.  Gifford Dep. at 153.   Kuiper also decided to forego hiring more staff for the holiday season.  Id.  During a visit on November 17, 2008, the district manager and another executive observed that the stockroom was poorly organized and products were misplaced. Gifford Dep. at 139-40; Girouard Decl. Ex. L.  Plaintiff attributed her team's failings in part to six new employees who were not familiar with the stockroom organization.  Gifford Dep. at 140.

During this time Plaintiff felt alienated from her younger coworkers.  Gifford Dep. at 265-66.  At a meeting led by Kuiper, Plaintiff was asked her view of the upcoming 2008 holiday season.  Plaintiff mentioned she had taken an economics course in college, and expressed her opinion that sales would drop due to the stock market crash and the Presidential election.  Gifford Dep. at 273.  A coworker made fun of her, asking, "[W]hat year did you take your economics class?"  Gifford Dep. at 273-74.  Kuiper noted Plaintiff must have seen a lot of changes over her career with the company.  Gifford Dep. at 274.  Plaintiff agreed, noting that when she started at Target they used paper forms instead of digital devices.  Id.  Another Executive Team Leader, Sean Fitzgerald, wisecracked, "Did you have to chisel the numbers into the stone?"  Gifford Dep. at 274.

Plaintiff also came under increasing criticism from Kuiper based on her job performance.  On December 10, 2008, a company safety auditor visited the store.  Plaintiff spoke with him about safety issues in the Logistics department; he later expressed to Kuiper concern that

Plaintiff appeared to be unaware of safety issues elsewhere in the store.  Gifford Dep. at 142-43;
Girouard Decl. Ex. L.  Problems with Logistics were identified during three district manager
visits on December 6, December 13 and December 21.  Gifford Dep. at 140-42; Girouard Decl.
Ex. L.  On December 23, 2008, a high-level company executive visited the store and identified
more problems in Logistics.  Gifford Dep. at 144-45; Girouard Decl. Ex. L.  Plaintiff concedes
the problems existed, but attributes them to conflicting direction from her superiors.  Gifford
Dep. at 145-47; Girouard Decl. Ex. L.

Plaintiff also had difficulty keeping Kuiper updated on her efforts.  For example, Plaintiff
neglected to provide Kuiper with monthly status updates from September through December
2008.  Gifford Dep. at 152-53; Girouard Decl. Ex. L.  Plaintiff also should have updated Kuiper
on her efforts to correct the performance of an underperforming Team Leader, but did not do so.
Gifford Dep. at 155-56; Girouard Decl. Ex. L.

On January 19, 2009, in the employee break area, Plaintiff saw a poster publicizing a
store game called "Ask an Exec," inviting employees to ask managers personal questions.
Gifford Dep. at 210, 263-65.  The poster listed examples of questions and answers attributed to
specific individuals, such as, "Can you wiggle your ears?  Aaron – Yes I can. . . . How did you
learn how to count?  Megan – My fingers and toes."  Next to the question, "What year were you
born?" was the answer, "Linda – 1910."  Neumann Decl. Ex. 13.

On January 20, 2009, after a regular status meeting, Plaintiff reported to Kuiper the
poster  was offensive and a form of age discrimination.  Gifford Dep. at 210.  According to
Plaintiff, Kuiper "was upset.  She went in the break room, came back, she apologized, she

compared me to her mother." Gifford Dep. at 211.[2]  Kuiper investigated, learned Onkka had

prepared the poster, and directed him to apologize to Plaintiff, which he did later that day.

Gifford Dep. at 211; Kuiper Decl. ¶ 10.

That same day, an anonymous complaint was submitted to Defendant's compliance

department, complaining about scheduling in the Brainerd store's Logistics department, and

criticizing Plaintiff, Onkka and Kuiper.  Neumann Decl. Ex. 14.  An investigation commenced;

Kuiper met with the Logistics staff and spoke with Plaintiff about how to improve scheduling.

Kuiper informed the compliance department of the steps she had taken, and advised them as a

"related" issue that she intended to administer a warning to Plaintiff.  Id.

On January 29, 2009, at another staff meeting, employees began to discuss the online

social-networking site Facebook.  Kuiper and Onkka inquired whether Plaintiff was familiar

with Facebook; Plaintiff explained that her granddaughters had introduced her to it.  Kuiper then

"said something like: You are lucky to have your granddaughters to keep you young."  Gifford

Dep. at 271.  Plaintiff felt this was teasing about her age.

In January 2009, Logistics had 28 "Green" days in a row.  Gifford Dep. at 223.   On

February 2, 2009, Kuiper administered a written warning, known as a "Corrective Action

Report," based on Plaintiff's unsatisfactory performance in the latter half of 2008.  Neumann

Decl. Ex. 16; Girouard Decl. Ex. L.  Plaintiff believes the warning was unjustified.  Gifford Dep.

at 129.  She acknowledged that the Logistics department had often failed to meet the company's

goals, but attributed the failures to employee departures rather than a lack of leadership.  Gifford

---

[2] Kuiper's version of events is that Plaintiff told Kuiper she was concerned she was not communicating well with younger employees.  Kuiper responded that age need not be a factor; although Plaintiff was closer in age to Kuiper's mother, Kuiper felt they were able to communicate well.  Kuiper Decl. ¶ 11.

Dep. at 130, 133.  She felt she had no control over staffing, which made it impossible to meet the company's expectations.  Gifford Dep. at 133.  Plaintiff also blamed her department's failings on the fact that she had been on vacation, and on contradictory directions from her superiors. Gifford Dep. at 134-46.

On February 3, 2009, Plaintiff began a previously-scheduled medical leave.  On March 2, 2009, while on leave, Plaintiff called the company's compliance hotline to file an internal complaint of age discrimination.   Neumann Decl. Ex. 17; Girouard Decl. Ex. GG ("Case History").  The investigation generated by Defendant in connection with Plaintiff's call reflects Plaintiff reported she had "a 'rough' year in Logistics," was on corrective action, and acknowledged "making some mistakes."  Case History at 2.  She explained the Brainerd store was challenging, and expressed regret at having accepted the position in Logistics.  Id.  Plaintiff felt she was being "forced out" of her job and stated, "I do not want this to go anywhere else but to the person that answers this request.  This is just a very private situation and I just want an answer to my questions.  Please, I am pleading for confidentiality!"  Id.

An investigator interviewed Plaintiff as well as Kuiper and Onkka.  Id. at 4-6.  Plaintiff identified four "examples" of "little things that did not feel right," including that Kuiper "compared(s) me to her mother," Onkka's poster "suggesting her birth year was 1910," that "male ETLs are younger, joke around, and often leave her out of that interaction," and "[t]here was a decision made regarding her TLs [Team Leaders] and no one discussed it with her."  Id. at 8.  Plaintiff was also troubled because Kuiper said her "corrective action is still pending Linda because you have worked for us for a long time."  Id.[3]  Plaintiff was troubled that Kuiper and

---

[3] In her Declaration, Plaintiff states, "Kuiper told me that it was taking her longer to complete my review because I had worked at the company for 'such a looooong time.'" Gifford Decl. ¶ 22.

Onkka had been informed of her complaint, and expressed concern that "it would look like she cooked up stuff because she went on corrective action." Id. at 8.  She withdrew her complaint. Id.

While still on corrective action, Plaintiff returned to work with restrictions on April 14, 2009.  Gifford Dep. at 157.  Plaintiff felt Kuiper's annual review of her performance for 2008 was not "fair" because she "was leading the best I could that I had done all these years" in the face of changing directives and "circumstances beyond my control."  Gifford Dep. at 123-26. Plaintiff did not agree with Kuiper's evaluation and signed the review followed by the initials "UP" indicating "under protest."  Gifford Dep. at 125.   Nonetheless, Plaintiff prepared an "action plan" to address areas where she needed to improve. Girouard Decl. Ex. O; Gifford Dep. 179-180.

Plaintiff's performance did not improve.  Plaintiff acknowledges she did not accomplish most of the tasks on her action plan, and by May 2009, had largely stopped trying.  Gifford Dep. at 180-81.  Plaintiff also concedes the Logistics department failed to meet its 11:00 a.m. deadline several times, for which she received counseling from Kuiper during weekly status meetings on April 21, 28 and May 5.  Gifford Dep. at 157-58; Girouard Decl. Ex. P.  On April 15 and 16, 2009, officials in charge of assets protection observed the Logistics department had misplaced items and did not accurately record their location.  Gifford Dep. at 159-160; Girouard Decl. Ex. P.  Kuiper asked Plaintiff to complete an action plan to remedy the misplaced items by May 5; Plaintiff submitted her plan three days late.  Gifford Dep. at 161; Girouard Decl. Ex. P.

Meanwhile, on May 5, 2009, during a store visit, the district manager criticized the Logistics department's truck unloading process.  Gifford Dep. at 158; Girouard Decl. Ex. P. That same day, Plaintiff allowed her department's employees to work past their scheduled end

time, incurring additional payroll expense.  Kuiper warned Plaintiff not to let it happen again.  It occurred twice more within a week.  Gifford Dep. at 161-62; Girouard Decl. Ex. P.  The Logistics department was rated "Red" during a store visit on May 12, 2009.  Girouard Ex. HH.  Kuiper directed Plaintiff to enter data into a calendar; one week later, Plaintiff still had not done so.  Gifford Dep. at 163; Girouard Decl. Ex. P.

Faced with pressure to meet company deadlines, Plaintiff began to falsify records.  On May 8, 2009, Onkka observed Logistics employees completing a task after Plaintiff had recorded they had finished.  Girouard Decl. Ex. Q.  On May 9, 2009, Plaintiff again prematurely recorded that the department had finished its work.  Onkka discovered the truth, and changed the records to reflect the actual completion time.  Id.; Gifford Dep. at 218-19.  Onkka reported to Kuiper that Plaintiff changed it back to the false numbers so that her team would be "Green."  Neumann Decl. Ex. 23; Girouard Decl. Ex. Q.  Plaintiff did not deny changing the numbers, but believed it was justified because "the store was a total mess" that day, and she wanted to motivate her employees when they were "very close" to the goal.  Gifford Dep. 220-21.

As of May 27, 2009, the Logistics department had failed to meet its goals and was "Red" 22 out of 25 days during the month. Gifford Dep. at 158, 250-56; Girouard Decl. Ex. P, T, U. Plaintiff states the failure record is because she was not allowed to authorize overtime.  Gifford Dep. at 158.  Also during the month of May 2009, the Logistics department misplaced items including merchandise worth approximately $1,000. Gifford Dep. at 213-15; Girouard Decl. Ex. R, S.  Plaintiff admits she personally failed to do a number of tasks required of her, including "coaching" employees, completing their annual reviews, doing "brand walks" with her Team Leaders, and completing her "Leader on Duty" responsibilities for shifts when she was the senior manager in the store.  Gifford Dep. at 167-71; Girouard Decl. Ex. P.  Plaintiff also admits the

company data accurately reflects her department failed to achieve the company's standards – standards which apply to every store. Gifford Dep. at 241-49; Girouard Decl. Ex. V, W-CC.

On May 29, 2009, Kuiper told Plaintiff her performance had not improved. Kuiper issued a final written warning and required Plaintiff to improve within 30 days or face termination. Gifford Dep. at 156; Kuiper Decl. ¶ 13; Neumann Decl. Ex. 27; Girouard Decl. Ex. P. At a meeting on June 9, 2009, Kuiper told Plaintiff that she would be terminated on June 29 if there was no improvement. Kuiper Decl. ¶ 14. The Logistics Department was "Green" on June 10 and June 12. Neumann Decl. Ex. 29. On June 12, 2009, a Friday, when Plaintiff left the store at the end of her shift, she asked to be presented with her options in writing, and requested time to think over the weekend. Neumann Decl. Ex. 30; Kuiper Decl. ¶ 16. She did not return to work. On June 22, 2009, she contacted Defendant insisting she had not resigned, but had been terminated. Neumann Decl. Ex. 30, 31.

At the time she left the company, Plaintiff was age 56, and had worked for the company for 37 years. Gifford Dep. at 8, 10. The company treated her as retired, and sent her a congratulatory package and a gift card. Neumann Decl. Exs. 32, 33. The employee who replaced Plaintiff was 23 years old. Gifford Decl. ¶ 41.

## III.  DISCUSSION

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)(same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(same). On a

motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

**B.     MHRA Age Discrimination Claim**

Gifford alleges that Target discriminated against her on the basis of age, in violation of the MHRA.[4] The MHRA prohibits discriminatory discipline and discharge of an employee based on age. Minn. Stat. § 363A.08, subd. 2 (2010).[5]

To establish age discrimination, a plaintiff may present either direct evidence of discrimination, or circumstantial evidence using the McDonnell Douglas burden-shifting test. Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).

Direct evidence is evidence of conduct or statements by the individual who made the adverse employment decision, "show[ing] a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011)

---

[4] Plaintiff's original claims under the Family and Medical Leave Act have been voluntarily dismissed [Docket Nos. 15, 16].

[5] The Minnesota Supreme Court has determined cases interpreting Title VII may be considered when interpreting the MHRA. Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 623 (Minn. 1988). The parties dispute whether the MHRA requires "but for" causation, or "a motivating factor" causation. Compare Rahlf v. Mo-Tech Corp., 642 F.3d 633, 637 n.2 (8th Cir. 2011), with McGrath v. TCF Bank Savings, 509 N.W.2d 365, 366 (Minn. 1993). Here, this is a distinction without a difference. Plaintiff must show that "she has been the victim of intentional discrimination." Anderson, 417 N.W.2d at 626. She is not required to prove that "discrimination was the sole cause of her discharge." See id.

(en banc).  Statements that "a woman can't handle" a particular job, or that "'women in sales were the worst thing' to happen to the company," are examples of direct evidence of discrimination.  Id. (citations omitted).  However, direct evidence does not include "facially and contextually neutral" statements by decisionmakers, nor does it include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process."  Id.; Hamblin v. Alliant Techsystems, Inc., 636 N.W.2d 150, 154 (Minn. Ct. App. 2001).

The remarks Plaintiff cites do not rise to the level of direct evidence.  Kuiper, the sole decisionmaker,[6] stated Plaintiff had "seen a lot of changes" during her career at Target, and compared Plaintiff to her mother.  When Plaintiff mentioned her granddaughters had introduced her to Facebook, Kuiper remarked that Plaintiff was lucky to have her granddaughters to keep her young.  In her Declaration, Plaintiff adds Kuiper told her to be more "energetic" and that Plaintiff had been with Target for "a looooong time."  Finally, when Plaintiff's employment ended, Defendant treated it as a retirement rather than a termination.

None of these remarks are direct evidence of age-related bias.  They are facially and contextually neutral, and indeed, could be construed as positive.  They reflect no negative stereotypes about older workers.  Cf. Hamblin, 636 N.W.2d at 152 ("Hire some new people . . . [y]ounger talent that can be trained"); Stageberg v. Minneapolis Golf Club, No. A04-943, 2005 WL 147712, *1 (Minn. Ct. App. January 25, 2005) (unpublished) (plaintiff "was 60 and he [decisionmaker] didn't know . . . how much longer she would work").  The evidence also reflects

---

[6] Plaintiff urges the Court to consider remarks by her coworkers, including Onkka. Because they are not decisionmakers, their statements are not direct evidence of discrimination. Hamblin, 636 N.W.2d at 154.

14

no specific link between the remarks and any adverse employment action.  Cf. Fisher v.

Pharmacia & Upjohn, 225 F.3d 915, 922 (8th Cir. 2000) ("we need to get rid of the old guys");

Hamblin, 636 N.W.2d at 152 (top executive states he wants "the older employees targeted" in

reduction-in-force to maximize cost savings).

Plaintiff argues that neutral "code words" – in this case, saying Plaintiff needed to be

more "energetic" and treating her departure as a "retirement" – are direct evidence of

discrimination.  See Stageberg, 2005 WL 147712, *4; McCrory v. Kraft Food Ingredients, 98

F.3d 1342 (table), 1996 WL 571146, *6 (6th Cir. 1996)  The Court does not agree.  A plaintiff

cannot create a fact issue of discrimination by simply claiming that an innocuous, facially neutral

expression is a code word for discrimination.  There must be some evidence that the

decisionmaker has used the word to mask bias toward a protected group.

References to an employee's "energy," or lack thereof, do not necessarily reflect age-

related bias.  See Blackwell v. Cole Taylor Bank, 152 F.3d 666, 671 (7th Cir. 1998) (statements

that employees were not "flexible" and "energetic" not evidence of age discrimination).[7]

Without more, Kuiper's statement that Plaintiff needed to be more "energetic" is not direct

evidence of discrimination.

References to "retirement" are also not direct evidence of discrimination.  While some

courts have held a decisionmaker's repeated suggestions that an employee "retire" may be direct

evidence of age-related bias, see McCrory, 1996 WL 571146, *6, the Minnesota Court of

Appeals has found similar remarks insufficient direct evidence to survive summary judgment on

an age discrimination claim under the MHRA. See Minell v. City of Minnetonka, No. A08-2183,

---

[7] Such remarks may, however, be circumstantial evidence of discrimination.  See
Stageberg, 2005 WL 147712, *4; see also Futrell v. J.I. Case, 38 F.3d 342, 347 (7th Cir. 1994).

2009 WL 2928317, *6 (Minn. Ct. App. Sept. 15, 2009) (unpublished).  Here, the record is devoid of evidence that Kuiper ever mentioned retirement to Plaintiff.  Plaintiff does not suggest Kuiper pressured her to retire; rather she complains that Target treated her departure as a retirement rather than a termination.  Such an after-the-fact administrative decision, standing alone, is not direct evidence of discrimination.[8]

As direct evidence is lacking, Plaintiff may turn to the burden-shifting test set forth in McDonnell Douglas.  To establish a prima facie case of discriminatory discharge, Plaintiff must show "(1) she is a member of a protected class, (2) she was qualified for the position from which she was discharged; and (3) was replaced by a non-member of the protected class."  See Hoover, 632 N.W.2d at 542.  It is undisputed that Plaintiff meets all these elements.

Because Plaintiff has established her prima facie case, she raises a presumption of discrimination, and the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  Legitimate, non-discriminatory reasons for discipline and termination include poor performance and failure to follow company policy.  See Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 443 (Minn. 1983) (poor performance); Hoover, 632 N.W.2d at 545 (failure to comply with policy).  Plaintiff admits her team often failed to meet Defendant's performance goals, and that on at least one occasion she entered a false completion time to make it meet the goal.  Plaintiff also admits she personally failed to meet some of Defendant's expectations.  Defendant has satisfied its burden of articulating a legitimate, non-discriminatory reason for its actions.

---

[8] Treating a termination as retirement may be construed as positive action, protecting the employee's eligibility for post-retirement company benefits and making it easier for the employee to find future employment.

At this stage, the presumption of discrimination disappears, and the burden shifts back to Plaintiff to show that Defendant's reasons are a pretext for discrimination.  <u>McDonnell Douglas</u>, 411 U.S. at 802.  Plaintiff may show Defendant's decision was a pretext for discrimination by offering "sufficient evidence for the trier of fact to infer that the employer's proffered legitimate nondiscriminatory reason is not only pretext but that it is pretext for discrimination."  <u>Hoover</u>, 632 N.W.2d at 546.  Plaintiff retains the ultimate burden of proving she was disciplined and terminated based on unlawful discrimination.  <u>Id.</u>

To prove pretext, Plaintiff is not required to disprove Defendant's reasons.  <u>See</u> <u>Strate v. Midwest Bankcentre, Inc.</u>, 398 F.3d 1011, 1021 (8th Cir. 2005).  She concedes her department failed to meet performance goals, and acknowledges that Kuiper received complaints from other employees about her performance.  She does not suggest Target's evaluations of her performance were inaccurate as a matter of fact.  <u>Cf.</u> <u>Fisher</u>, 225 F.3d at 921 (evidence showed evaluation did not accurately reflect plaintiff's knowledge of product line).  She was evaluated by the same criteria applicable to others in her position, and does not cite any irregularities or problems with the evaluation process.  <u>Cf.</u> <u>Hamblin</u>, 636 N.W.2d at 154-55 (evaluation criteria lacked uniformity); <u>Futrell</u>, 38 F.3d at 349 (evaluation was made after the fact, but backdated to appear contemporaneous).

Instead, Plaintiff argues Defendant's evaluations unfairly blamed her for circumstances beyond her control.  She claims a "close reading" of certain records shows the Logistics department morale improved on her watch.  Pl. Mem. at 29.  She claims she was not given adequate guidance or support.  Pl. Mem. at 30.  Such evidence is not sufficient to call into question the accuracy of Defendant's performance evaluations or to raise an inference of discrimination.  An employer's failure to communicate expectations does not support an

inference of discriminatory animus.  Riser v. Target Corp., 458 F.3d 817, 821 (8th Cir. 2006).

And while Plaintiff may take issue with how Defendant runs its stores or how it treats its

employees, this Court does "not sit as a super-personnel department reviewing the wisdom or

fairness of the business judgments made by employers" other than to determine whether they are

intentionally discriminatory.  See Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 934 (8th Cir.

2011).

There is no question of fact that Plaintiff did not meet Target's standards.  However, if

the standards were applied unequally based on her age, she nonetheless may be able to show

Target's performance concerns were a pretext for age discrimination.  See Riser, 458 F.3d at

821.  To make this claim, Plaintiff must present evidence demonstrating that she was treated

differently from younger employees who were similarly situated in "all relevant respects,"

meaning that they were "involved in or accused of the same offense and [were] disciplined in

different ways."  Id.  Plaintiff  suggests that another Target Logistics department was having

similar problems, and that her own department was not doing all that badly relative to other

departments in the troubled Brainerd store.  However she has not identified any younger Target

manager of a similarly-underperforming department who avoided discipline and termination.

As further evidence of pretext, Plaintiff relies on her lengthy, positive employment

history with Defendant, coupled with teasing and insensitive remarks by supervisors and

coworkers that she believes reflect Defendant's "ageist corporate atmosphere."  Pl. Mem. at 28.

Evidence of a strong employment history may, together with other evidence, cast doubt upon an

employer's stated reason for termination.  See Hoover, 632 N.W.2d at 546; see also Strate, 398

F.3d at 1020.  This fact pattern is not one where Plaintiff was suddenly terminated after an

unblemished employment record.  After 35 years of excellent performance in other positions,

followed by several months of poor performance in a new position, Plaintiff was disciplined. When Plaintiff's performance did not improve, she was terminated. Under such circumstances, Plaintiff's history of good performance in other positions does not cast doubt on Defendant's evaluation of her performance as the manager of Logistics.

Plaintiff also suggests she was a victim of Defendant's "ageist corporate atmosphere." She implies that the expression "Fast, Fun and Friendly," a corporate slogan repeated by Onkka, reflects a company-wide bias toward youth. However the statement is facially age neutral and has no causal connection to any adverse employment action. There is simply no evidence, other than Plaintiff's opinion, that the slogan is in any way related to her discipline or discharge. A facially neutral corporate slogan is not equivalent to a remark by a high-ranking executive, later incorporated into company policy, that "older employees [should be] targeted" for termination. See Hamblin, 636 N.W.2d at 152. No reasonable jury could find the slogan itself to be evidence of age-related bias.

Plaintiff also relies on comments by Kuiper, Onkka and others. But the comments, taken individually or together, do not raise an issue of fact as to whether Target's reason for terminating Plaintiff's employment was a pretext for discrimination. As already noted above, Kuiper's comments are age-neutral, and do not reflect negative stereotypes about age and ability. Statements that Kuiper regarded Plaintiff much like her mother, or that (in the context of a discussion of Facebook) Plaintiff was lucky to have her granddaughters to keep her young, are not "code phrases" reflecting age-based stereotypes. Cf. E.E.O.C. v. Board of Regents of the Univ. of Wisconsin Sys., 288 F.3d 296, 303 (7th Cir. 2002) (plaintiff's skills suited to the "pre-electronic" era); McElhinney v. Quest Diagnostics, Inc., 152 F. Supp. 2d 745, 750 (E.D. Pa. 2001) (plaintiff "would not even know how to turn it [a laptop computer] on"). Indeed, the

evidence may reflect that Kuiper saw Plaintiff's maturity as a positive factor in her decision to offer Plaintiff the opportunity to transfer to the Logistics department.[9]

Target does not attempt to defend Onkka's misguided "Ask an Exec" poster, but its response to Plaintiff's complaint was prompt and efficient. Kuiper apologized to Plaintiff, took down the poster, spoke to Onkka, and directed Onkka to apologize to Plaintiff, which he did that same day. There is no evidence that Onkka made any similar remarks afterward. Defendant's prompt and effective response to this isolated incident negates any inference of an "ageist corporate atmosphere."

Similarly, the remarks by Plaintiff's coworkers fall into the category of stray remarks by nondecisionmakers that are not evidence of age discrimination. Hamblin, 636 N.W.2d at 154. Even if the comments reflect a coworker's age-based discriminatory animus, Plaintiff must also show a specific link between that animus and Kuiper's decision to discipline and fire her. See Torgerson, 643 F.3d at 1046. She has not done so.

Plaintiff has failed to submit evidence showing a genuine issue of material fact as to pretext. Accordingly, Defendant is entitled to summary judgment on her claims for age discrimination under the MHRA.

**C.     MHRA Reprisal Claim**

The MHRA also prohibits reprisal against an employee who opposes practices prohibited by the MHRA. See Minn. Stat. § 363A.15(1). Reprisal includes "any form of intimidation, retaliation, or harassment." Id. Where, as here, no direct evidence of reprisal is offered, reprisal

---

[9] The Court does not apply the "same-actor inference" because Kuiper did not actually hire Plaintiff. Cf. Fitzgerald v. Action, Inc., 521 F.3d 867, 877 (8th Cir. 2008); Peterson v. Scott County, 406 F.3d 515, 522 (8th Cir. 2005), overruled in part on other grounds by Torgerson, 643 F.3d 1031; Spera v. Kosieradski Smith Law Firm, LLC, No. A09-1907, 2010 WL 2650540, *4 (Minn. Ct. App. July 6, 2010) (unpublished).

claims under the MHRA are subject to the <u>McDonnell Douglas</u> framework.  <u>Hoover</u>, 632

N.W.2d at 548.

First, Plaintiff must establish a prima facie case that (1) she engaged in statutorily

protected conduct; (2) she suffered adverse employment action; and (3) a causal connection

existed between the two.  <u>Id.</u>  Only the third element is in dispute.

Plaintiff asserts two instances of protected activity – her complaint to Kuiper about the

"Ask an Exec" poster on January 20, 2009, and her complaint to the company hotline on March

3, 2009.  She argues that Kuiper's decision to place her on corrective action on February 2, 2009

was motivated by retaliation for the first, and Kuiper's decision to terminate her in June 2009

was motivated by retaliation for the second.  Plaintiff's evidence does not raise an issue of fact

with respect to either incident.

Plaintiff may demonstrate a causal connection through evidence of "circumstances that

justify an inference that the employer has actual or imputed knowledge of the protected activity

and the adverse employment action follows closely in time."  <u>Hubbard</u>, 330 N.W.2d at 445.   For

example, a termination two days after protected activity may support an inference of causation,

<u>see id.</u>, a two week interval "barely so," and a delay of two months would not.  <u>See Lewis v. St.</u>

<u>Cloud State Univ.</u>, 467 F.3d 1133, 1138 (8th Cir. 2006) (<u>citing Kipp v. Missouri Highway &</u>

<u>Transp. Comm'n</u>, 280 F.3d 893, 897 (8th Cir. 2002) and <u>Smith v. Allen Health Sys., Inc.</u>, 302

F.3d 827, 833 (8th Cir. 2002)).   The Court finds the timing here – approximately two weeks for

the first incident, and approximately three months for the second – does not, by itself, support an

inference as to causation.

The record contains substantial evidence that Defendant's concerns with Plaintiff's

performance began months before Plaintiff reported the poster incident, and continued for

months after she made the call to the hotline.  "Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."  Kasper v. Federated Mut. Ins. Co., 425 F.3d 496, 504 (8th Cir. 2005).  On the evidence presented, no reasonable jury could find that Plaintiff was disciplined or discharged in reprisal for her complaints of age discrimination.

Plaintiff accepted a challenge to turn the Logistics department around, knowing full well that four of her predecessors in the position had tried and failed.   She was unable to meet the company's performance expectations, and was terminated.  She has not shown any evidence of age discrimination or reprisal, and for that reason, Defendant is entitled to summary judgment.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 37] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____ s/Ann D. Montgomery _____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  August 31, 2011.